# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

ANNMARIE L. GANCARCIK,

        Plaintiff,

    v.                                        Case No. 12-C-1118

CAROLYN W. COLVIN,
Commissioner for Social Security,

        Defendant.

---

## DECISION AND ORDER

This is an action for judicial review of the final decision of the Commissioner of Social Security denying Plaintiff Annmarie L. Gancarcik's application for Disability Insurance Benefits (DIB) under Title II of the Social Security Act ("Act"), 42 U.S.C. § 401 *et seq*., and Supplemental Security Income (SSI) under Title XVI of the Act, 42 U.S.C. § 1381 *et seq.* Plaintiff filed applications for DIB and SSI in August 2009 and April 2010, respectively, alleging disability beginning January 18, 2005, due to neurocardiogenic syncope, autonomic peripheral neuropathy, and degenerative disc disease. (R. 144, 160, 185, 203.) At the time of her alleged onset date, Plaintiff was 34 years old. Her application was denied initially and on reconsideration, and Plaintiff requested a hearing. (R. 83-94.) On September 7, 2011, a hearing was held before Administrative Law Judge (ALJ) Wayne L. Ritter at which Plaintiff, represented by counsel, and a vocational expert testified. (R. 58-82.)

In a decision issued on October 6, 2011, the ALJ concluded that Plaintiff retained the residual functional capacity (RFC) to perform medium work requiring only simple routine tasks

with limitations in handling and fingering, and no concentrated exposure to workplace hazards, heat or irritants. With this RFC and based on Plaintiff's vocational profile, the ALJ found that there was a significant number of jobs Plaintiff could perform and that she was therefore not disabled within the meaning of the Act. (R. 53.) The Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner. (R. 1-3.) This action followed.

## BACKGROUND

As noted above, Plaintiff claims she has been unable to work since January 18, 2005. When she first applied for DIB in August 2009, Plaintiff identified two impairments as the cause of her disability: neurocardiogenic syncope and autonomic peripheral neuropathy. (R. 185.) Several months later she added degenerative disc disease. (R. 203, 209.) She lived with her fiancé/husband and two sons, ages twenty and nine at the time of the hearing. The twenty-year-old was disabled. (R. 68, 161.)

### 1. Plaintiff's Testimony

At the time of the hearing in September 2011, Plaintiff was delivering newspapers for the Green Bay Press Gazette with the help of her son. She drove to the houses on her route and placed the papers in the roadside receptacles from the car. Her son would deliver those that required delivery at the door. The time it would take to complete the job ranged from one-and-a-half hours on a good day to almost three hours on a bad day. Plaintiff had been performing that job since January 2010. (R. 66.) According to a Work Activity Report she completed in August 2009, Plaintiff last worked for a one-week period tending bar in June 2008, as she had done in the two previous years. (R. 174.) She also worked as a general laborer for a two-week period in 2006. The

2

last full-time employment Plaintiff had held was as a childcare teacher at Encompass Early Education and Care from May 2004 to January 18, 2005, when she claimed she stopped working due to her medical condition.  (R. 175, 156, 180-81.)  Before that she had worked at OfficeMax, first in Brookfield and then in Green Bay.  In the Brookfield store, Plaintiff had done logistics in the shipping and receiving department.  When she moved to Green Bay, she was a manager trainee for various stores and would go in and clean them up.  (R. 67, 377.)

Plaintiff completed an Adult Function Report in which she described her typical day as getting up, taking her medication, eating breakfast, taking a shower and then looking at her planner. She would do what needs to be done in the planner, then have lunch, check the planner again, and help her younger son with his homework.  She would then check the planner to see what dinner to make, make the dinner, watch television with her sons, get washed for bed and then take her medication.  Plaintiff stated she was unable to sleep through the night but was able to handle her own personal care, though it would take a little time.  (R. 193-94.)  She was able to prepare basic meals consisting of meat; pasta, rice or potato; and vegetables.  She would also do household chores such as dust, laundry and vacuum, but it would take her the whole day to do them.  (R. 195.)  She would go outside to sit or get the mail, could drive a car and went shopping for groceries and birthday or holiday presents maybe twice a month.  She handled money and paid the family's bills online, and enjoyed reading books, watching shows and cross-stitching.  She also enjoyed talking and playing games with others, and loved to garden but it caused too much pain in her hands.  In addition to grocery shopping, she regularly went to doctors appointments and church.  (R. 196-97.) Plaintiff estimated she could not lift ten pounds or more without dropping the item.  She stated her legs and feet go numb and affect her ability to sit, stand, kneel, and climb stairs.  She also claimed

3

she had difficulty with concentration, memory and completing tasks, and said she had to write everything down. She estimated she could walk about two blocks before she would need to rest for five-to-ten minutes, and had difficulty following oral instructions and with stress. (R. 198-99.) At the hearing, Plaintiff confirmed that her previous report was still accurate. (R. 67-68.) In response to counsel's question, Plaintiff estimate that she could stand and/or walk five hours in an eight-hour day. Counsel asked if she had recalled telling him that she could only stand or walk two hours in an eight-hour day, but she could not recall. (R. 72.)

Plaintiff's attorney indicated at the hearing that his client was not claiming disability because of degenerative disc disease. He acknowledged that she had not been treated for any disc problems and that her claim was based on her neuropathy. Counsel also acknowledged that she had no recent episodes of syncope. (R. 69-70.) The records show it was well controlled with medication and she had not had "a single episode in many years." (R. 372.) Plaintiff agreed she had received no mental health treatment from any mental health treatment provider and that she had never been hospitalized for mental health difficulties. (R. 71.) She reported no asthma attacks that required emergency room care or hospitalization, and just used her inhaler and called her doctor the next day if she had difficulties. (R. 69.) As to her neuropathy, Plaintiff testified that she first started having pain in her hands and feet in 2005. Treatment was in the form of prescription medications and therapy. At the time of the hearing, she was taking cyclobenzaprine and tramadol. (R. 68.)

**2. Medical Records**

The first mention of possible symptoms of neuropathy in the medical record appears in June 2007. Plaintiff was referred by her family doctor for a neurological consultation. On June 25, 2007, she was seen by Dr. Shaik Ubaid at Prevea Clinic in Green Bay. According to the history taken by

4

Dr. Ubaid, Plaintiff complained of "occasional tingling in the left side of the scalp." (R. 595.) She stated that it happened only when she was sleeping on her left side. She reported that she had involvement of the left side of her face once or twice, but this had not reoccurred. She also complained of left-sided numbness, especially in her arm, but at times also involving the leg, when she sleeps on her left side. Sometimes she experienced it in her right arm when she slept on her right side. She denied any weakness, visual symptoms, incontinence or balance problems. (R. 595.) Dr. Ubaid conducted a neurological examination and ordered an MRI, a carotid ultrasound, cervical X-rays and, later, a nerve conduction study, all of which were negative. (R. 596, 683, 686, 685.)

In a follow-up visit on August 2, 2007, Plaintiff reported that she was experiencing numbness in both legs when she was sitting on the floor "for some time." (R. 593.) She also repeated her complaint that she experienced numbness on the side on which she was laying, but noted she never experienced numbness on the side or extremity on which there is no pressure from her weight. She stated she had no further episodes of numbness to her face or scalp, and said she had lost weight and was feeling better. Based on the negative results from the tests he had ordered and the history given by his patient, Dr. Ubaid concluded that Plaintiff's "episodic and transient symptoms most likely are secondary to the pressure that she was causing on her sciatic nerve when she is sitting down on a hard floor." (R. 593.) Dr. Ubaid advised Plaintiff that he did not think she had any brain or spinal cord pathology, and advised her to call for an appointment if she develops any worsening of her symptoms. (R. 594.)

Plaintiff returned to Dr. Ubaid on August 23, 2007, and reported that she still gets numb in both legs when she sits on the floor, but the numbness in her arms is now related to the position she is in while laying down. She stated the numbness in her arms lasts for a few minutes after she

5

notices it. Dr. Ubaid noted that Plaintiff's numbness "does not fit typical picture of neuropathy." He ordered an EMG and nerve conduction study to evaluate her complaints and to rule out neuropathy, and again advised her to lose weight and adopt a healthy lifestyle. (R. 591-592.)

The nerve conduction study and EMG were negative. (R. 680.) At a November 21, 2007 follow-up visit, Plaintiff again complained of numbness, mostly when she first woke up in the morning in both legs from her knees to her feet and in both arms. Plaintiff reported she did not experience numbness on every morning, and it would last between a few minutes and an hour. Dr. Ubaid ordered an MRI of her cervical spine to evaluate for any cervical cord pathology that could be contributing to her symptoms in all four extremities, and strongly advised Plaintiff to lose weight. (R. 590.)

On December 24, 2007, Plaintiff saw Dr. Jean Dill in Dr. Ubaid's stead. She was told that, like the other tests, the MRI was normal. (R. 588.) Dr. Dill decided to start Plaintiff on gabapentin to see if it helped. (R. 589.) Plaintiff returned on January 24, 2008, and complained of "a lot of pain her neck area and numbness and tingling down her arms." While cheering during a football game, she experienced sharp pain to her arm and shoulder, and her family doctor had sent her to physical therapy. The gabapentin had not helped, and Dr. Dill started Plaintiff on cyclobenzaprine. (R. 586-87.)

On March 5, 2008, Plaintiff again reported a lot of pain to her neck area and numbness and tingling down her arms, sometimes down her leg, and sometimes the top of her head. (R. 584.) She reported she had stopped physical therapy because it was not helpful, but continued to work out almost daily. Dr. Dill switched her medication to Imiprimine, an anti-depressant. (R. 585.)

6

Plaintiff returned on April 7, 2008. She continued her complaints of numbness and tingling, and said her left arm was becoming weak. She had no improvement with Imipramine, and Dr. Dill suggested they try Lyrica. Plaintiff stated she did not want to try another medication, but thought she needed more scans done. (R. 582.) Dr. Dill then referred her to Dr. Gerald Bannasch. (R. 312.)

Dr. Bannasch saw Plaintiff on May 13, 2008. He noted her chief complaint was unusual numbness on the left side of her body which comes and goes, right-sided numbness in the arm at times, and feeling of sharp pain in her groin. Dr. Bannasch noted that "patient has been worked up and there has been found to be nothing that we can find on scans either having to do with her cerebrovascular system or the head and neck to explain these problems." (R. 310.) He observed that Plaintiff had a history of migraine headaches and had gained over thirty pounds over the last two years when the symptoms started. Dr. Bannasch noted that Plaintiff "has almost a LaBelle Indifference when she talks about all her various and sundry problems." (R. 310.) LaBelle Indifference refers to "A naive, inappropriate lack of emotion or concern for the perceptions by others of one's disability, usually seen in persons with conversion disorder." The Free Dictionary, http://medical-dictionary.thefreedictionary.com/la+belle+indifference (last visited August 30, 2013). Dr. Bannasch opined that Gancarcik's paresthesias was more likely caused by a "migraine variant" and that she likely suffered from sleep apnea. (R. 310.) Although Dr. Bannasch ordered a sleep study, this never occurred because Gancarcik's insurer refused to pay for it. (R. 294.)

Apparently unhappy with Dr. Bannasch, Plaintiff requested a second opinion and was referred to Dr. Concepcion Santillan of Neurology Consultants. She saw Dr. Santillan in September 2008, and Dr. Santillan referred her to Dr. Alexandru Barboi at the Medical College of Wisconsin

7

for testing and evaluation of a possible autonomic disorder. (R. 280-81.) In the meantime, Dr. Santillan ordered an EMG of Plaintiff's lower extremities, which was negative. R. 281, 265-66.)

Dr. Barboi conducted the autonomic testing in December 2008. (R. 246-51, 281.) Plaintiff underwent a quantitative sudomotor axon reflex test (Q-SART), a thermoregulatory sweat test (TST), a tilt table test, a Valsalva test, and testing of her heart rate and deep breathing. Dr. Barboi noted that the Q-SART responses, the Valsalva ratios, the heart rate to deep breathing were normal. No blood pressure abnormalities were observed. However, both the TST and tilt table tests were abnormal. The thermal regulatory sweat test showed absent sweating in both lower extremities and distal fingers, and the tilt-table test revealed mild hypertension and tachycardia. Dr. Barboi ultimately agreed with Dr. Santillan's suspicion of "mild autonomic instability." (R. 248.) Dr. Barboi stated that Plaintiff "does not seem to harbor a disabling neurological disorder and/or a progressive/neurodegenerative neurological problem." (*Id.*) He recommended treatment if the hypertension and tachycardia become problematic.

Dr. Santillan went over the results with Plaintiff on February 18, 2009. She discussed with Plaintiff the diagnosis, long-term prognosis and supportive treatment. She then started Plaintiff on the medication Topamax and directed her to return in six months. (R. 279.) In May 2009, Plaintiff reported she could not tolerate the side effects of Topamax and was switched to Cymbalta. In July 2009, she returned and reported that the Cymbalta seemed to be having no effect. She explained she was planning on having a third child and had concerns about going on another medication. She also stated, however, that it took her a considerable period of time to do normal daily activities. She described situations such as pouring a glass of orange juice where she cannot feel and misses the

8

glass. She stated that her whole left side at times feels dead. Plaintiff's prescription was changed to Lyrica and she was advised not to become pregnant while taking it. (R. 276.)

On September 1, 2009, Plaintiff was involved in a car accident and seen at a hospital in Appleton. According to the history provided at the hospital, she was hit from behind by a car going highway speed. A cervical collar was placed on Plaintiff and she was strapped to a long board at the scene, although other than a hematoma on the side of her head, some tenderness and a headache, she had no other apparent injuries. Her husband who was seated in the passenger side of the front seat was uninjured. (R. 425-28.) Upon arrival at the hospital, Plaintiff was awake, alert, and articulate. However, shortly thereafter, she changed dramatically and her speech became slurred, almost baby talk. (R. 427-28.) She had no complaints of neck pain, or weakness, numbness, tingling, or pain in her extremities. Although she complained of feeling sleepy, there was no nausea, vomiting or vison disturbance. A CT scan of her head and spine were negative. In particular, only mild degenerative disc disease at C6-7 was noted on the CT scan of her spine. (R. 426-27.) On re-examination, she became alert and appropriate, and the slow childlike speech improved. The doctor attributed the child-like reaction to short-term hysteria and discharged her in the company of her husband. (R. 429.)

When she saw her family doctor several days later Plaintiff was taking Ibuprofen and complained of soreness in the torso region up to her neck. She was given a muscle relaxant and Vicodin for pain at night. (R. 285.) Over the next several months, Plaintiff complained of chronic headaches and was seen by various doctors at Neurology Consultants. She was seen by Dr. Kaufman on September 16, 2009, who prescribed amitriptyline. (R. 385.) In a follow-up visit on October 16, 2009, she reported to another neurologist, Dr. Heverly, that she continued to experience

9

problems with balance and short-term memory. In addition, she reported continuing problems with headaches rating her pain as a "6". (R. 384.) She saw Dr. Kaufman again on November 5, 2009, and told him she was still having headaches in the posterior occipital area. A repeat MRI was negative. In another follow-up visit with Dr. Santillan on November 19, 2009, Plaintiff reported intermittent numbness and tingling in all extremities. Dr. Santillan noted that her neck was hypersensitive, especially the right occipital area. She ordered an MRI of the cervical spine, gave her a prescription for Zonegran and referred her for aqua therapy. Plaintiff requested thereafter to be seen only by Dr. Santillan. (R. 382.)

Plaintiff next saw Dr. Santillan on March 17, 2010. She stated she tried aqua therapy but it made her symptoms worse. She reported she had been dropping things and broke several glasses. Her hands hurt when she was writing, it feels cold and damp on her neck and shoulders, and she was having difficulty sleeping. She also reported she was experiencing short-term memory loss. (R. 742.) Dr. Santillan reduced her medication and ordered blood tests. (R. 743.) Following an April 2010 visit, Dr. Santillan noted Plaintiff "continues to have disabling paresthesias for small fiber neuropathy" and made further adjustments to her medication. (R. 740.) On August 11, 2010, Plaintiff reported pain on even simple activity. Her husband was not working, and she and her child were working the paper route in the morning to bring in income. Dr. Santillan noted that Plaintiff had developed side effects on the medications she had prescribed or they did not help. She referred her to a rehab doctor to see if any other medication would work and directed her to return in six months. (R. 738-39.)

Dr. Santillan referred Plaintiff for physical therapy, which she engaged in from late December 2009 to April 2010. Her physical therapist, Lindi Schlotthauer noted toward the

10

conclusion of the therapy sessions that Plaintiff did not show significant signs of progress. Plaintiff reported that she experienced an overall improvement of about 25 percent, but still experienced significant pain from her symptoms. (R. 464.) Schlotthauer reported that Plaintiff could not sit more than fifteen minutes or drive long distances without discomfort, she experienced shaking in her left hand on and off, and she could only sleep for about three to four hours at a time due to her discomfort. (R. 462.)

Dr. Santillan, in a report addressed to Dr. Richards on March 8, 2011, described some of Plaintiff's symptoms as follows:

> [Plaintiff] continues to be in pain that is worse with changes in weather. She twitches and drops things from her hands. Her family does a lot of things for her and prefers for her to be sitting and not lifting any objects. She had dropped a coffee pot. She continues to work her newspaper route; however, it takes her a longer time when she folds newspapers. It feels like there is a hammer pounding on her hands. She prefers to be barefoot; however, it feels as though she is walking on nails.

(R. 755.) Dr. Santillan listed the medications that had been prescribed to treat Plaintiff's pain, including Depakote, Lyrica, Gabapentin, imipramine, Tapamax, Cymbalta, amitriptyline, Tizanidine, Zonegran, Keppra, and OxyContin, all of which were ineffective. (*Id.*) Dr. Santillan opined that "[a]s a result of her disabling paresthesias, she cannot be gainfully employed." (*Id.*) At the same time, Dr. Santillan encouraged Plaintiff to be active, "since inactivity can make her small fiber neuropathy worse." (R. 756.) Dr. Santillan completed a medical source statement on the same day as the aforementioned report to Dr. Richards. She opined that Plaintiff could never lift fifty pounds, could occasionally lift twenty pounds, and frequently lift ten pounds or less. No limits were noted as to the length of time she could sit, stand or walk in an eight-hour day. She also

11

stated that Plaintiff would only be capable of low stress work, would require frequent breaks, and would miss more than four days per month as a result of her peripheral neuropathy. (R. 751-54.)

It should be noted that in all of the physical exams before the various doctors Plaintiff saw between 2007 and 2011, other than in September 2009 before Dr. Kaufman shortly after her accident, she consistently had 5/5 strength in her upper and lower extremities, had normal gait, sensation, and reflexes, and muscle stretch reflex testing revealed 2/4 reflexes in the biceps, triceps, quadriceps, and ankle. (*See, e.g.*, R. 247-48, 380-81, 742.) When Dr. Santillan saw her in November 2009, she noted that Plaintiff had no atrophy. Her muscle tone was normal in upper and lower extremities. (R. 381-82.)

On November 9, 2009, Plaintiff was seen by Dr. Monica Jacobson, a consultative examiner, for a psychological evaluation. Plaintiff reported that she had never seen a psychologist or counselor and never had any mental health treatment. (R. 376.) She reported that she was in pain, but her pain medication did not work. She stated further that there were days when "one side of her body simply does not work." (*Id.*) Plaintiff largely corroborated her previous statements in the function report in regard to the description of her daily activities. She reported that she had problems with her memory, but Dr. Jacobson did not conduct any independent tests to substantiate Plaintiff's statements. Dr. Jacobson diagnosed Plaintiff with depressive disorder and mild cognitive impairment including memory problems.

Dr. King, a state agency physician, found in his psychiatric review that Plaintiff did not suffer from a medically determinable psychiatric impairment. Dr. King's opinion was affirmed as written by Dr. Spear. (R. 264, 436.) Dr. Philip Cohen completed a physical RFC based on his review of the record in December 2009. Dr. Cohen concluded that Plaintiff was capable of

12

performing medium work. He highlighted the neurologic exam which resulted in Plaintiff's diagnosis of mild autonomic instability, mild hypertension, psudomotor dysfunction, and mild vasomotor variability. Dr. Cohen opined that Plaintiff's conditions were further complicated by her severe obesity. (R. 399.) He also stated that Plaintiff's "allegations of pain, sleep disturbance, lifting difficulties, numbness in legs/feet and wrist pain are found to be only partially credible as medical evidence does not fully support them." (*Id.*) Dr. Cohen's physical RFC finding was affirmed as written by Dr. Khorshidi in March 2010. (R. 435.)

### 3. Vocational Expert

A vocational expert (VE) also testified at the hearing. The VE was asked to assume that Plaintiff had an RFC for medium work except she was limited to no more than frequent handling and fingering with both upper extremities, that she must avoid concentrated exposure to extreme heat and to pulmonary irritants such as fumes, odors, dust and gasses, and to workplace hazards such as unprotected heights and the use of moving machinery, and that she is limited to work involving only simple, routine and repetitive tasks. With this assumption in place, the VE testified that a person of Plaintiff's age, education and work experience could not perform her past jobs as a child care worker, material handler, or receiving clerk. However, the VE testified that such a person would be able to perform a substantial number of other jobs that exist in the economy of the State, including machine tender, assembler, kitchen helper, cafeteria attendant, cleaner/housekeeper, and cashier. (R. 75-77.) The ALJ also asked the VE whether there were jobs in the regional economy Plaintiff could perform if she was able to perform light work with the same limitations. He again responded that there were and identified cafeteria attendant, cleaner/housekeeper, and cashier as among those jobs such a person would be able to perform. (R. 77-78.) Finally, the VE

13

was asked whether there were jobs that a person with the same limitations could perform at the sedentary level of exertion. Again, the VE identified a number of jobs within the State that such a person could perform, including charge account clerk, order clerk, checker, and inspector. (R. 79.) The VE also testified, however, that if such a person was likely to be absent more than one day a month or require more than the usual breaks during the day, there were no jobs available. The VE likewise testified that if such a person was limited to less than occasional fingering and handling she would likewise be unemployable. (R. 80, 82.)

**4. ALJ Decision**

In his decision of October 6, 2011, the ALJ determined that Plaintiff was not engaged in substantial gainful activity since January 18, 2005, the alleged onset date. He further found that Plaintiff suffered from autonomic dysfunction and peripheral neuropathy. The ALJ noted that while the record confirmed that Plaintiff suffered form asthma, syncope, and headaches, these conditions were not severe under the social security regulations. He explained that there was no evidence of persistent symptoms of syncope, that Plaintiff testified that she had no hospital presentations related to her asthma and successfully used inhalers to control it, and that while her headaches appeared following her accident, she was able to treat the headaches with an over-the-counter pain medication. The ALJ explained that while Plaintiff did not suffer from a severe mental limitation, the record indicated that she was mildly limited in her ability to remember, concentrate, and complete tasks. He stated that even though Dr. Cohen referred to a 2007 MRI study that showed mild degenerative disc disease, there was no evidence that this limited Plaintiff. In addition, he noted Plaintiff's explanation during her testimony that her degenerative disc disease was likely related to her neuropathy and would not cause any additional limitations beyond those caused by

14

the neuropathy. Finally, the ALJ concluded that none of Plaintiff's impairments either singly or in combination met a listing.

For his RFC assessment, the ALJ found that Plaintiff could perform medium work as defined by 20 C.F.R. §§ 404.1567(c) and 416.967(c). However, she was limited to no more than frequent handling and fingering with both upper extremities. She must avoid concentrated exposure to extreme heat and pulmonary irritants, such as fumes, odors, dust and gases, and avoid workplace hazards such as unprotected heights and the use of moving machinery. She was further limited to work involving simple, routine, and repetitive tasks.

Based upon the Plaintiff's RCF to perform medium work with the limitations set forth above, the ALJ concluded that Plaintiff could not perform any past relevant work as a receiving clerk, child care worker, or material handler due to her limitation to simple, routine, and repetitive work. Plaintiff was 34 years of age at the time of her alleged onset date and she completed a high school education. Therefore, in order to be disabled under the regulations, it had to be determined that she could not perform even sedentary work. *See* 20 C.F.R. Pt. 404 Subpt. P, App. 2. The ALJ concluded, however, that a person with such an RFC would be able to perform work as a machine tender (medium work), assembler (medium work), kitchen helper (medium work), cafeteria attendant (light work), cleaner/housekeeper (light work), and cashier (light work). Assuming an RFC with the same limitations but an exertional level for no more than light work, the ALJ reached the same conclusion that there were substantial number of jobs that Plaintiff could perform. Because there existed a significant number of jobs in the economy which Plaintiff could perform even with her physical RFC limited to light work, the ALJ concluded that Plaintiff was not disabled under the regulations.

15

## STANDARD OF REVIEW

An ALJ's conclusion of no disability is reviewed with deference and will be upheld if it is supported by substantial evidence. Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Schaaf v. Astrue*, 602 F.3d 869, 874 (7th Cir. 2010) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). The court reviews the entire record but does not substitute its judgment for that of the Commissioner by reconsidering facts, reweighing evidence, resolving conflicts in evidence, or deciding questions of credibility. *Estok v. Apfel*, 152 F.3d 636, 638 (7th Cir. 1998). An ALJ need not specifically address every piece of evidence, but must provide a "logical bridge" between the evidence and her conclusions. *O'Connor-Spinner v. Astrue*, 627 F.3d 614, 618 (7th Cir. 2010) (citing *Getch v. Astrue*, 539 F.3d 473, 480 (7th Cir. 2008)). An ALJ must also "confront evidence that does not support his conclusion and explain why it was rejected." *Kasarsky v. Barnhart*, 335 F.3d 539, 543 (7th Cir. 2003). An ALJ's credibility determination is entitled to special deference because the ALJ has the opportunity to observe the claimant testifying. *Castile v. Astrue*, 617 F.3d 923, 928-29 (7th Cir. 2010). Accordingly, credibility determinations are reversed only if they are patently wrong. *Id.* The ALJ is also expected to follow the Agency's own rulings and regulations in making his determination. Failure to do so, unless the error is harmless, also requires reversal. *Prochaska v. Barnhart*, 454 F.3d 731, 736-37 (7th Cir. 2006).

## ANALYSIS

Plaintiff contends that the ALJ erred in three respects. She contends (1) that the ALJ's determinations of her severe impairments and her RFC are wholly unsupported by the record; (2)

16

that the ALJ failed to properly weigh the medical opinions according to agency rulings and regulations; and (3) that the ALJ's credibility determination is not supported by substantial evidence. (Pl.'s Br. At 9, ECF No. 11.) In effect, however, Plaintiff's three separate claims of error boil down to one: that the ALJ didn't believe her statements concerning the limiting effects of her neuropathy. If the ALJ had found Plaintiff's testimony and her reports to her health care providers about the extent of her pain and limitations credible, his determinations as to the severity of her impairments, her RFC and the weight of the various medical opinions would have been different. It is therefore to the ALJ's credibility determination that the court first turns.

### A. Credibility Assessment

First, Plaintiff takes issue with the ALJ's statement that the intensity, persistence, and limiting effect of her symptoms were "not credible to the extent they are inconsistent with the above residual functional capacity assessment." (R. 48.) She contends that this is "meaningless boilerplate" and is insufficient to support an adverse credibility finding.

Plaintiff's initial argument on this point is predicated on the Seventh Circuit's decision in *Parker v. Astrue*, 597 F.3d 920, 922 (7th Cir. 2010). There, Judge Posner criticized the agency for its repeated use of similar language in explaining its assessment of the credibility of a claimant's testimony concerning the intensity, persistence and limiting effects of her symptoms. Each of the ALJ's in the three cases before the court had stated "the undersigned finds that the claimant's medically determinable impairments would reasonably be expected to produce the alleged symptoms, but that the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible." 597 F.3d at 921. The court's criticism in *Parker* was directed primarily at the statement that the claimant's testimony was "not entirely

17

credible." "The statement by a trier of fact that a witness's testimony is 'not entirely credible,'" the court noted, "yields no clue to what weight the trier of fact gave the testimony." *Id.* at 922. In this case, the ALJ did not use the phrase "not entirely credible." Instead, he found Plaintiff's statements "not credible to the extent they are inconsistent with the above residual functional capacity assessment." (R. 48.) This language, however, has been found to be "even worse." *Bjornson v. Astrue*, 671 F.3d 640, 645 (7th Cir. 2012).

Yet, even where the ALJ does use the language criticized by the court in *Parker*, reversal is not required for that reason alone. Given the volume of cases the agency decides, it is not surprising that formulaic or boilerplate expressions have become commonplace in ALJ decisions. "[T]he simple fact that an ALJ used boilerplate language does not automatically undermine or discredit the ALJ's ultimate conclusion if he otherwise points to information that justifies his credibility determination." *Pepper v. Colvin*, 712 F.3d 351, 367-68 (7th Cir. 2013). Here, after an extensive discussion of the relevant evidence and the boilerplate language, the ALJ devoted the next four paragraphs of his decision to discussing the reasons for his credibility finding. In his discussion, the ALJ went beyond the boilerplate and stated the following specific reasons for discounting the credibility of Plaintiff's statements regarding the intensity, persistence, and limiting effects of her condition: 1) her statements were inconsistent with her reported daily activities; 2) she continued to express a desire to become pregnant and have another child at the same time she claimed to have had disabling pain; 3) she testified in response to her attorney's question that she could stand and walk for five hours; 4) her treatment seemed quite conservative in view of the severity of pain she reported; and 5) she claimed an onset date of January 2005, despite the absence

18

of significant evidence of disability until substantially later.  The question presented then is whether the reasons provided by the ALJ are sufficient.

Plaintiff contends that the ALJ's credibility findings were based on errors in reasoning.  An ALJ's credibility determination that a claimant's allegations of pain and the limiting effects of her condition are exaggerated is ordinarily conclusive on review.  But when an ALJ bases "his credibility determination on serious errors in reasoning rather than merely the demeanor of the witness," then remand is required.  *Carradine v. Barnhart*, 360 F.3d 751, 754 (7th Cir. 2004) (citing *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000)).  At the same time, conclusive proof that a claimant is exaggerating the extent of her pain or disability is not required.  Indeed, evidence that is conclusive is seldom, if ever, available.  If in order to reject a claimant's testimony that she was unable to hold a job an ALJ was required to point to irrefutable evidence that she can, then few if any claims could be denied.

Here, as noted, the ALJ offered five different reasons for discounting the credibility of Plaintiff's testimony, noting that "no single factor drives the credibility assessment." (R. 48.) The ALJ first noted that Plaintiff's claim that she could lift no more than ten pounds was inconsistent with her activities of daily living.  For example, she stated that she maintained a paper route for a daily newspaper, and did laundry, vacuumed, dusted, shopped for groceries and made meals for a family of four.  In the ALJ's view, this level of activity was inconsistent with Plaintiff's claim that she could lift no more then ten pounds.

Plaintiff notes that she also stated that sometimes it takes her a long time to perform these activities or her family helps her, and argues that without further details about exactly how she went about performing them, it is impossible to conclude with certainty that she exaggerated her

19

limitations.  But again, certainty about such matters is neither possible or required.  The ALJ's inference that given the kinds of activities she regularly undertook, Plaintiff was able to lift more than ten pounds or sit more than fifteen minutes is not unreasonable.  Presumably, she sat for more than fifteen minutes when she completed her paper route each morning.  Indeed, even Dr. Santillan, her treating physician, thought she could lift ten pounds frequently and twenty pound occasionally. (R. 753.)  And she put no limit on the length of time she could sit.  (R. 752.)

Plaintiff also argues that her daily activities do not show that she can perform medium work. But the ALJ didn't say they did.  He considered her daily activities in relation to her statements about what she claimed she could do, not what he found her RFC to be based on the entire record. It is entirely reasonable for an ALJ to conclude that a claimant is not credible when her statements concerning her limitations appear inconsistent with her daily activities, even if the daily activities she reports do not suggest an ability to perform medium work.  This is not to say that his determination as to Plaintiff's credibility did not factor into his RFC determination.  If the record suggests a claimant has a tendency to exaggerate her symptoms, then it is reasonable for the ALJ to look to other evidence to determine what her actual RFC might be.

The ALJ next noted that Plaintiff testified in response to her attorney's question that she could stand and walk five hours in an eight hour workday, which is entirely inconsistent with her reported limitations.  (R 49.)  Plaintiff failed to alter her response even after her attorney suggested that she had previously told him she could only stand and walk a total of two hours in an eight-hour workday, stating simply "I don't remember."  (R. 72.)  Plaintiff argues that even if she can be on her feet five hours in an eight-hour day, it still does not support a finding that she could perform medium work because that would require her to be on her feet six hours a day.  But again, that's not

the point of a credibility analysis. The ALJ was comparing the limitations she claimed she had with other evidence in the record to determine whether her claims were credible. If, as she spontaneously testified, she was capable of standing and/or walking five hours in an eight-hour day, then her statements concerning the extent of her limitations were not very credible. At least it was not unreasonable for the ALJ to so conclude.

The ALJ also cited Plaintiff's expressed desire to get pregnant at the same time she claimed she was disabled as an indication she was exaggerating her symptoms. He noted "she also indicated a desire to become pregnant, which demonstrates she felt capable of the demands of caring for another child." (R. 49.) Calling this one of the ALJ's "more troubling findings," Plaintiff contends that the record cited by the ALJ is from August 2005, prior to the worsening of her symptoms. (Pl.'s Br. 24, ECF No. 11.) She also contends that the record "is devoid of any foundation to support a finding that Gancarcik would have been primarily responsible for caring for the child." (*Id.*) She therefore contends that her "unfulfilled desire to have a child six years before the hearing has no impact on her credibility in terms of her disability claim." (*Id.*)

In fact, however, Plaintiff continued to discuss her plans, not a bare desire, to have a third child as late as July 2009, well after she claims she was unable to engage in substantial gainful employment. (R. 386.) And while the record does not contain irrefutable evidence that Plaintiff, as opposed to someone else would have been primarily responsible for caring for the child, it appears unlikely that the family could have afforded to hire someone else to provide the required care. Again, while not conclusive evidence on the issue, it was not unreasonable for the ALJ to conclude that a reasonable person would not plan to get pregnant if she was suffering from the kind of debilitating pain that rendered her incapable of holding full time employment.

21

The ALJ also thought it significant that Plaintiff claimed that the onset of her disability was January 2005. He noted that "the claimant alleges she has not been able to work full time since January 2005 due to her impairments. However, a clinic note dated August 22, 2005, shows the claimant lost her job in January and continued to look for a new job." (R. 49 (citing 5F/62 (R. 343.))) Plaintiff contends that this is not a proper basis for assessing her credibility since she was pro se at the time and simply used the date on which she stopped working as her alleged onset date. Plaintiff also notes that counsel indicated the possibility of amending the alleged onset date to conform to the evidence. (Pl.'s Br. at 23, ECF No. 11.)

Plaintiff's argument notwithstanding, the ALJ's conclusion is not unreasonable. Plaintiff declared under threat of perjury not that she stopped working in January 2005 but that "my disability began on January 18, 2005. (R. 160, 165.) In January 2005, Plaintiff had not been diagnosed with neuropathy, and indeed, it wasn't until some two years later that her medical records reveal any report of symptoms of the disorder. (R. 686.) At the time of a physical examination in January 2008, three years after her claimed onset date, Plaintiff was exercising three times a week at Curves. (R. 607.) An even later report indicates she was exercising four times per week. (R. 773.) The fact that her attorney suggests at the hearing a willingness to amend the onset date to a date two years later doesn't change that fact that Plaintiff swore under oath that she was disabled and unable to work at a time when even she now concedes it was not true. Again, it was not inappropriate to rely upon this fact as a reason to doubt Plaintiff's credibility.

Finally, the ALJ also reasoned that Plaintiff's statements concerning the intensity, persistence and limiting extent of her symptoms were not consistent with the relatively conservative medical treatment she had received. (R. 48.) He noted she "takes prescription medication, checks

in with her doctor every six months, and has participated in an unsuccessful course of physical therapy." (R. 49.) "Disability to the degree alleged by the claimant," the ALJ reasoned, "would reasonably be expected to prompt more aggressive treatment modalities." (R. 49.) Plaintiff argues that the ALJ "inserted his own medical knowledge in place of that of the medical providers." ( Pl.'s Br. 22, ECF No. 11.) She contends that there is no indication in the record that a more aggressive treatment regimen was recommended. In fact, the medical evidence suggests no further treatment was available. She notes that she has tried at least ten different prescription drugs and undergone physical therapy without success. Absent some evidence that further treatment was available, Plaintiff argues that the ALJ's reasoning is flawed.

Here, it would appear Plaintiff may have a point. The Commissioner offers no response to this argument. To be sure, it does seem strange that someone with disabling pain would be satisfied with seeing the same doctor every six months and wouldn't seek out other opinions or alternatives instead. But the record does not disclose what if any other options were available to Plaintiff. In other words, it is not clear what aggressive treatment would consist of. Even disregarding this reason, however, it remains the case that the ALJ provided detailed reasons for his credibility determination. The court cannot say that his credibility determination was "patently wrong." *See Diaz v. Chater*, 55 F.3d 300, 308 (7th Cir. 1995) ("[W]e have repeatedly stated that an ALJ's credibility determination will not be disturbed unless it is patently wrong.").

In sum, as to each specific point of credibility cited by the ALJ, Plaintiff is correct that none of these explicitly and necessarily mean she was being untruthful. There are no smoking guns. For example, it is conceivable that an individual with debilitating pain might nevertheless desire to have another child. Such matters are highly personal. Even though it is conceivable, however, it is

23

unlikely enough (say, less than fifty percent) that an ALJ is certainly entitled to consider that fact among the many others he considered in creating a larger mosaic of the claimant's credibility. The weighing of such factors and the determination of a witness's testimony are entrusted to the factfinder, here, the ALJ. Accordingly, such a determination should be reversed "only if the claimant can show it was 'patently wrong.'" *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000) (quoting *Herr v. Sullivan*, 912 F.2d 178, 181 (7th Cir.1990)). Reversal is not required here.

## B. Assessment of Medical Evidence

### 1. Dr. Santillan

Dr. Santillan opined that "as a result of her disabling paresthesias, [Plaintiff] cannot be gainfully employed." (R. 756.) The ALJ did not give controlling weight to Dr. Santillan's opinion that Plaintiff was disabled. The ALJ stated that "the inconsistency between Dr. Santillan's statement that the claimant cannot be gainfully employed and his specific functional capacity assessment limiting her to light, low stress work render his conclusion less than reliable." (R. 49.) The ALJ also explained that Dr. Santillan's opinion that Plaintiff would miss more than four days of work per month "has not corresponding support in the treatment records and no rationale provided elsewhere." (R. 50.) He also noted that "total disability is not reflected in the claimant's relatively full panoply of activities of daily living as reported in her Functional Report–Adult or her hearing testimony." (*Id.*). Finally, the ALJ noted that the determination of disability is reserved to the Commissioner and Dr. Santillan's opinion in this regard is not controlling." (*Id.*)

Plaintiff contends this was error. She concedes that Dr. Santillan's statement – "due to her disabling paresthesias, she cannot be gainfully employed" – cannot be given controlling weight

24

under SSR 96-5p because a determination of disability is an issue reserved to the Commissioner. But she disputes the ALJ's conclusion that Dr. Santillan's statement that she cannot be gainfully employed was inconsistent with the specific functional capacity assessment she completed. She also contends that the ALJ was required to accept Dr. Santillan's opinions that Plaintiff would require extra breaks during the day and would miss at least four days per month as a result of her impairment. The fact that neither conclusion was supported by objective tests, Plaintiff contends, is irrelevant because: "There is no diagnostic test or blood test that can accurately predict how many missed days of work per month a claimant may have. That is something that can only be assessed by a treatment provider that knows and understands the medical conditions of the claimant." (Pl.'s Br. 11, ECF No. 16.) Plaintiff also contends that her reported daily activities are entirely consistent with her claimed disability.

An ALJ must give controlling weight to a treating physician's opinions so long as it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and it is not "inconsistent with the other substantial evidence in the case record." SSR 96-2p, 1996 WL 374188, at * 1. However, "[c]ontrolling weight may not be given to a treating source's medical opinion unless the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques." *Id.* And "[e]ven if a treating source's medical opinion is well- supported, controlling weight may not be given to the opinion unless it also is 'not inconsistent' with the other substantial evidence in the case record." (*Id.*) "An ALJ thus may discount a treating physician's medical opinion if it [sic] the opinion 'is inconsistent with the opinion of a consulting physician or when the treating physician's opinion is internally inconsistent, as long as he minimally articulates his reasons

25

for crediting or rejecting evidence of disability.'" *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007) (quoting *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004)).

Here, the ALJ sufficiently articulated his reasons for not giving Dr. Santillan's opinion controlling weight. As Plaintiff concedes, Dr. Santillan's conclusion that Plaintiff had disabling paresthesias and could not be gainfully employed was not controlling since the ultimate issue of whether a claimant is disabled is exclusively reserved to the Commissioner. 20 C.F.R. § 404.1527(e)(1); *see also Vossen v. Astrue,* 612 F.3d 1011, 1015 (8th Cir. 2010) (giving such opinions controlling weight would "in effect, confer upon the treating source the authority to make" disability determinations (quoting SSR 96-5p, 1996 WL 374183, *2)). Furthermore, the medical source statement that Dr. Santillan completed, except for the statement that Plaintiff would miss more than four days of work per month as a result of her impairment or treatment, was entirely consistent with the ALJ's finding that she was not disabled. Dr. Santillan listed no limitations in Plaintiff's ability to sit, stand or walk, with normal breaks, in an eight-hour day. (R. 752.) She also indicated that while Plaintiff could never lift fifty pounds, she could occasionally lift twenty pounds and frequently lift ten pounds or less. (R. 753.) Although she would sometimes need to take unscheduled breaks because of "chronic fatigue," or "pain/paresthesias, numbness," Dr. Santillan offered no estimate as to how often this would occur or how long a break she would require. (R. 752.) Dr. Santillan also noted that Plaintiff would be capable of low stress work. (R. 754.) Given the absence of other functional limitations, the ALJ's characterization of Dr. Santillan's report as inconsistent with her statement that Plaintiff could not be gainfully employed was not unreasonable.

More importantly, Dr. Santillan's opinion that Plaintiff would miss at least four days of work per month appears no where else in the record and is not supported by medically acceptable clinical

26

and laboratory diagnostic techniques. Plaintiff suggests that since there are no tests that can be used to assess how often, if at all, a person will be absent as a result of such an impairment, no more than what has been offered by Dr. Santillan is required. It may be true that there are no objective tests that can determine such likely absences, but it does not follow that the doctor's opinion on the matter should be considered controlling. That would seem especially true where, as here, the treating physician's opinion is inconsistent with other medical evidence. Dr. Cohen for example, concluded from his review of the records that Plaintiff had no such limitation. He noted that on exam, Plaintiff's strength, sensation, reflexes, and gait have consistently tested within normal limits. (R. 399.) He also noted that "a neurological exam in February of 2009 resulted in a diagnosis of mild autonomic instability, mild hypertension, psudomotor dysfunction and mild vasomotor instability." (*Id.*) In Dr. Cohen's opinion, "claimant's allegations of pain, sleep disturbance, lifting difficulties, numbness in legs/feet and wrist pain are found to be only partially credible as medical evidence does not fully support them." (*Id.*) Dr. Cohen's RFC was affirmed by another consulting physician, Dr. Mina Khorshidi, upon her review of the file on March 5, 2010. (R. 435.) In addition, Plaintiff had an "essentially normal well woman exam" as recently as May 27, 2011. (R. 772, 774.) At that time, she reported no concerns with sleeping, indicating she was able to sleep six to seven hours per night and denied any neurological or mental health concerns. The report also indicates she was exercising at Curves four times a week. (R. 772, 773.) For all of these reasons, the ALJ was not bound by Dr. Santillan's opinion.

### 2. P.T. Schlotthauer

Plaintiff also contends that the ALJ erred in failing to credit the opinions of the physical therapist she saw between December 2009 and March 2010. A physical therapist's opinions cannot be given controlling weight, but they are entitled to consideration. *Barrett v. Barnhart*, 355 F.3d

1065, 1067 (7th Cir. 2004). Here, Schlotthauer's opinion is relevant. This is because Plaintiff's peripheral neuropathy is a chronic condition and, therefore, the "question of ability to work becomes foremost and it is a question concerning which physical therapists have significant expertise." *Id.* at 1068. The ALJ stated that Schlotthauer's opinion that Plaintiff was limited to sitting for fifteen minutes without discomfort was "overly severe." (R. 50.) He based this on the fact that he only observed Plaintiff stand once during an hour long hearing. Plaintiff contends that the ALJ's reasoning is flawed because the hearing was actually only 39 minutes and the fact that Plaintiff stood once during that time is actually consistent with Schlotthauer's opinion. These arguments appear to be splitting hairs on the degree of consistency.

The ALJ also reasoned that Schlotthauer's opinions were exaggerated because they were inconsistent with Plaintiff's range of daily activities. Her daily activities included not only fixing the meals, cleaning, and doing the laundry for a family of four, but also delivering the morning paper with her son. She began that job on January 24, 2010, shortly after she began her physical therapy with Ms Schlotthauer, and continued performing it through the date of the hearing. According to Plaintiff, she drove the one-and-a-half to three hours it took to complete the route and placed the papers in the roadside receptacles while her son made the porch deliveries. (R. 66.) Although she also claimed that on bad days, she had to get out and readjust, the ALJ found her statements, to the extent inconsistent with the RFC he determined, less than credible. For these reasons, the ALJ did not err in giving less weight to the opinions of Ms. Schlothauer.

### 3. Dr. Jacobson

Plaintiff asserts that the ALJ's RFC finding limiting her to simple, routine, and repetitive tasks is inconsistent with his statement that "the diagnosis of a mild cognitive impairment [is]

unsupported by objective medical evidence." (R. 51.) The ALJ rejected Dr. Jacobson's diagnosis of depressive disorder and mild cognitive impairment because there was no objective evidence to support this finding. Plaintiff stated that she never received any prior psychological treatment for depression or a cognitive disorder. The ALJ included the limitation to simple routine, and repetitive tasks "as a precaution" because "the claimant has reported stress and difficulty following written instructions." (R. 51.) Dr. Jacobson's diagnosis of mild cognitive impairment was grounded on Plaintiff's own statements as to her memory problems. (R. 379.) In reaching her diagnosis, Dr. Jacobson did not perform any cognitive testing, but appeared to base her diagnosis entirely on her interview of Plaintiff. The lack of any historical treatment records for depression or her cognitive impairment was a sufficient reason for the ALJ not to accord Dr. Jacobson's opinion substantial weight, especially since she did not conduct any additional testing to corroborate Plaintiff's statements concerning her memory problems. Moreover, under the regulations, the existence of an impairment must be shown by appropriate medical evidence, which was lacking in Dr. Jacobson's report. *See* 20 C.F.R. §§ 404.1508, 404.1512(b), 416.908, 416.912(b). The weight the ALJ gave to Dr. Jacobson's opinion was reasonable and remand cannot be granted on this ground.

### C. Severe Impairments & Physical RFC Assessment

Plaintiff argues that the ALJ erred in step two as to his findings of her severe impairments. She contends that the ALJ did not properly consider her headaches, asthma, or syncope as severe impairments. The ALJ's determination that Plaintiff's asthma and syncope did not constitute a severe impairment was reasonable because these conditions were successfully treated and there is no indication that these conditions imposed any additional limitations on her. *See Skinner v. Astrue*, 478 F.3d 836, 845 (7th Cir. 2007) (stating that where symptoms are largely controlled with proper

medication and treatment, the ALJ is not required to find that claimant suffered from disabling impairments). The ALJ reasonably relied on the medical evidence and on Plaintiff's own representations during the hearing in support of his finding that her asthma and syncope did not amount to a severe impairment.

Plaintiff asserts that the ALJ did not adequately investigate the limiting effects that her headaches had on her. She testified that she was previously prescribed Vicodin for her headaches and that this was ineffective to relieve her headaches. Instead, she took ibuprofen every four hours each day. The ALJ did not ask her whether this over-the-counter medication helped control her symptoms. There is a notable absence in the record that Plaintiff's headaches were debilitating or had any limiting effects on her abilities. Nevertheless, she contends that her daily headaches were likely to impact her ability to focus and stay on task. Even if the ALJ erred in his determination that her headaches did not impose a severe limitation in step two of his decision, his RFC finding limiting Plaintiff to simple, routine, and repetitive work would have reasonably accommodated any limitations her headaches may have caused. Therefore, any error would be harmless. *See Bradley v. Barnhart*, 175 Fed. Appx. 87, 90 (7th Cir. 2006); *Castile v. Astrue*, 617 F.3d 923, 926-27 (7th Cir. 2010) ("[T]he step two determination of severity is 'merely a threshold requirement.'" (quoting *Hickman v. Apfel*, 187 F.3d 683, 688 (7th Cir. 1999))). In addition, it is the claimant's burden to prove that an impairment is severe. *Castile*, 617 F.3d at 926. Plaintiff failed to establish that her headaches, or for that matter her asthma or syncope condition, constituted a severe impairment and therefore, this is not a basis for error.

Plaintiff also argues that the ALJ's RFC assessment that she could perform medium work with limitations was unreasonable in light of the evidence. In particular, she asserts that his RFC

assessment is flawed due to his errors in the amount of weight he gave to Plaintiff's treating physician's medical opinions while crediting Dr. Cohen's opinion.

But the ALJ also found that even if Plaintiff could perform only light work with the same limitations, the result would be the same. The VE testified that there were still a substantial number of jobs in the State that a person with Plaintiff's age, education and experience could perform. (R. 53.) Indeed, even if Plaintiff could perform only sedentary work with the same limitations, there were still jobs Plaintiff could perform. (R. 79-80.) Given the ALJ's alternative finding that there were jobs Plaintiff could perform even if she was capable of only light work, Plaintiff's argument that he erred in finding her capable of medium work is harmless at best.

## CONCLUSION

The record certainly contains evidence that would support a finding that Plaintiff is in fact disabled within the meaning of the Act. But that is not the question for a court reviewing a decision by the Commissioner. The question is whether the decision the Commissioner did make is supported by substantial evidence in the record. For the reasons stated above, the court concludes that it is. The decision of the Commissioner is therefore affirmed.

Dated this  17th  day of September, 2013.

 s/ William C. Griesbach
William C. Griesbach, Chief Judge
United States District Court